UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JUN 0 4 2004 ca

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

LASALLE TECHNOLOGY INC., CHICAGO INVESTMENT GROUP, LLC, and PATRICK CARROLL, an individual,

Plaintiffs,

vs.

BERNARD RICE, and individual, MM SQUARED L.L.C., a Delaware Corporation, ABN AMRO, INC., a New York Corporation, WEISS & BLOCK, CHTD., an Illinois Corporation, SCHULTZ & CHEZ, an Illinois Limited Liability Partnership, JOSE LABOY, an individual, NANCY STAFFORD, an individual, SHELDON COHEN, an individual,

Defendants.

No. 04 C 2043

Judge ~~Gottschall~~ Coar

**WEISS & BLOCK, CHTD.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendant, Weiss & Block, Chtd. ("W&B"), by its attorneys, Thomas L. Browne and Peter E. Pederson, and pursuant to Fed.R.Civ.P. 12(b)(6), moves to dismiss plaintiffs' complaint for failure to state a claim upon which relief may be granted. In support of this motion, W&B states as follows:

## I. INTRODUCTION

Plaintiffs, LaSalle Technology, Inc. ("LTI"), Chicago Investment Group, LLC ("CIG"), and Patrick Carroll, have filed a filed a 16 count complaint against W&B and seven other defendants, purporting to allege violations of federal and state securities law, claims for common law fraud and negligent misrepresentation, and claims under the Illinois Consumer Fraud Act. The complaint arises from a December 23, 2002 agreement in which LTI agreed to purchase, and defendant Bernard Rice agreed to sell, 100% of the membership interests in defendant MM Squared, LLC ("$MM^2$") (Cplt., attached as Ex. A, ¶ 23). Plaintiffs allege that, in the agreement ("Purchase Agreement"), Rice falsely stated that $MM^2$ was not involved in litigation, that Rice



owned 100% of the $MM^2$ interests, and that $MM^2$ ran its own operations (Cplt. ¶¶ 51-53).

Plaintiffs do not allege that W&B played any role in the drafting or negotiation of the Purchase Agreement. The sole factual allegation concerning W&B is that, two months after LTI executed the agreement, W&B, while acting as Rice's lawyers, presented LTI with an Amended and Restated Purchase Agreement ("Amended Agreement") that revealed the alleged misrepresentations in the original agreement. Thus, plaintiffs contend that W&B prevented them from proceeding with the transaction on the basis of the alleged misstatements in the original agreement. The complaint further alleges that, because the Amended Agreement changed the terms of the deal and included a schedule that falsified $MM^2$'s liabilities, LTI refused to sign the Amended Agreement or to make the payment due on February 28, 2003 (Cplt. ¶¶ 50, 52).

The complaint does not state a claim for relief against W&B, and this defendant should be dismissed for the following well-supported reasons:

- LTI's claim under Rule 10b-5, 17 CFR § 240.10b-5, and § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), fails because LTI cannot allege reasonable reliance, scienter, or a material misrepresentation. The one misstatement attributed to W&B involves the alleged overstatement, by $8,500, of a liability of $MM^2$. This misstatement is immaterial as a matter of law because it constituted less than 1% of the consideration LTI allegedly agreed to pay for $MM^2$. Moreover, LTI cannot establish that it relied on the misstatement, as it occurred after LTI agreed to purchase $MM^2$, and LTI has failed to plead specific facts establishing a "strong inference" that W&B acted with an intent to deceive or reckless disregard for the truth. LTI's inability to plead scienter, materiality, and reliance requires dismissal of both its securities fraud claim (Ct. I) and its common law fraud claim (Ct. VI).

- The Rule 10b-5 claim (Ct. I) that CIG and Carroll have asserted fails because these plaintiffs did not purchase or sell securities in any transaction in which W&B is alleged to have made a false statement. CIG and Carroll therefore cannot allege any of the elements of a Rule 10b-5 claim. The common law fraud claim asserted by these plaintiffs (Ct. VI) fails for the same reason.

- The plaintiffs cannot state a claim under the Illinois Securities Law of 1953, 815 ILCS § 5/1, *et seq.*, (Ct. III) because the statute does not apply to attorneys who, like W&B, neither sold the issuer's securities, nor served as its officers or directors.

- Plaintiffs cannot maintain suit against W&B under the Consumer Fraud Act, 815

ILCS § 505/1, (Ct. IV) because the statute does not apply to lawyers providing legal services.

- Last, plaintiffs cannot state a claim against W&B for negligent misrepresentation (Ct. VII) because, as a matter of law, W&B owed them no legal duty. In an adversarial representation, a lawyer will owe a non-party a duty of care only if the primary purpose of the representation was to confer a direct benefit on the third party. Here, W&B allegedly represented the plaintiffs' adversary in a stock sale (Rice), and they plead no facts to suggest that the purpose of the representation was to directly benefit them (*Id.* at ¶ 54). As a result, W&B owed no duty of care to plaintiffs, and their negligent misrepresentation claim fails.

## II. ALLEGATIONS OF THE COMPLAINT

Plaintiff LTI allegedly develops software "that allows individuals and professional traders to trade stocks and options electronically" (¶ 2).[1] LTI's customers allegedly pay its trading commissions to plaintiff CIG, which is authorized to receive the payments because it is a registered broker-dealer with the National Association of Securities Dealers ("NASD"). LTI allegedly pays CIG a percentage of each commission as compensation for CIG's services (¶ 21). Plaintiff Carroll allegedly is a former employee of Investec Ernst & Company ("Investec") who sought to merge his options execution business with $MM^2$ and Rice at the same time Rice sought to sell $MM^2$ to LTI (¶¶ 31-32).

On an unspecified date, LTI allegedly entered into negotiations to acquire $MM^2$ from Rice. LTI wanted to purchase $MM^2$ primarily to obtain its proprietary trading applications and software, including the software's sourcecode (¶ 22). Rice, who was $MM^2$'s managing member, allegedly told LTI that $MM^2$ had "free and clear ownership of ***ALL*** interest necessary to transfer" the software and sourcecode to LTI (*Id.*). On December 23, 2002, LTI and Rice allegedly entered into the Purchase Agreement, which called for Rice to sell LTI 100% of the $MM^2$ membership interests in return for 500,000 shares of LTI common stock and $1,000,000, to paid as follows: (1) on December 23, 2002, LTI was to pay Rice $25,000; (2) on the closing date,

[1] Because this section of W&B's motion cites only to the complaint, citations omit the abbreviation "Cplt."

February 28, 2003, LTI was to pay Rice $475,000; (3) also on February 28, 2003, LTI was to execute a promissory note for the balance of $500,000, with a maturity date of June 30, 2003 which could be extended if $MM^2$'s net profit fell below a specified amount (¶ 27).

According to the complaint, Rice falsely stated in the Purchase Agreement that he owned 100% of the outstanding membership interests in $MM^2$ (¶ 23), although, in November 2002, he allegedly assigned a 15% interest to Carroll (¶ 34). Further, the Purchase Agreement allegedly indicated there was no litigation involving $MM^2$ (¶ 29), although Investec had instituted arbitration proceedings against $MM^2$ over "the ownership of the license of the Options Software" which was the primary reason for LTI's interest in the transaction (¶ 29).

Plaintiffs allege that, at the same time Rice was negotiating the sale of $MM^2$ to LTI, in December 2002, Rice urged Carroll to join him in a venture that would combine Carroll's option execution business with $MM^2$'s business (¶ 32). The complaint further alleges that, in August 2002, Carroll paid Rice $150,000 for a 15% interest in $MM^2$, which Rice assigned to Carroll in November 2002 (¶ 34). On January 3, 2003, Rice and Carroll allegedly signed a Letter of Intent under which "Carroll, Rice, and $MM^2$ would merge their interests to form a new limited liability company" that would combine Carroll's and $MM^2$'s businesses (¶ 35).

Plaintiffs allege that on February 21, 2003, a few days before the scheduled closing of the Purchase Agreement, $MM^2$ and Investec settled the arbitration proceedings that Rice allegedly failed to disclose in the Purchase Agreement. In the settlement, Investec granted $MM^2$ a "perpetual and exclusive license of the Options Software" in return for $400,000. The settlement also allegedly terminated Rice's consulting agreement with Investec (¶¶ 36-37).

Plaintiffs allege that, in February 2003, Rice told Carroll he had decided to sell $MM^2$ to LTI rather than proceed with the merger outlined in the Letter of Intent (¶ 39). To allow the LTI

transaction to go forward, Rice allegedly asked Carroll to assign his 15% interest in $MM^2$ to LTI. Rice also allegedly told Carroll that, in return for the assignment, Carroll would receive the "consideration set forth in Exhibit C to the Amended and Restated Purchase Agreement," which allegedly consisted of $15,000 to be paid at closing, 75,000 shares of LTI stock, and a promissory note in the amount of $52,590 (¶ 41). The complaint alleges that, on February 28, 2003, Carroll assigned his 15% interest to LTI (*Id.*). Defendant W&B is not alleged to have communicated with Carroll or to have played any role in Rice's negotiations with Carroll.

Also on February 28, 2003, Rice and LTI's president Robert Gross allegedly met for the closing on the Purchase Agreement. Plaintiffs allege that, at the meeting, "Rice's attorneys, W&B" presented Gross for the first time with the Amended Agreement (¶ 50). According to the complaint, the Amended Agreement revealed that, contrary to the representations in the original, "Rice did not own all of $MM^2$'s interests;" various other persons owned interests in $MM^2$; "the operations of $MM^2$ were conducted primarily by Investec" which called into doubt the capabilities of $MM^2$ and its proprietary rights to the software's sourcecode; and $MM^2$ owed more than "$500,000 in liabilities in the form of loans previously made to" $MM^2$ (¶¶ 51-54, 97).

Plaintiffs allege that the Amended Agreement included a schedule which indicated that $MM^2$ owed $400,000 in liabilities payable at closing and $147,000 in liabilities payable at the maturity date (¶ 54 f.n. 2). The sole misstatement attributed to W&B involves the item in the schedule which indicated that $MM^2$ owed W&B $8,500. Plaintiffs allege that $MM^2$ owed W&B nothing because it had given W&B a $7,218 retainer. Without any supporting factual allegations, plaintiffs conclude that W&B was "aware of the misrepresentations in the original Agreement" and that it participated in Rice's alleged fraud by "assisting in the preparation of the Amended Agreement, and [by] falsifying or otherwise 'fixing' $MM^2$'s liabilities" in the schedule

(¶ 97, f.n. 5). The complaint does not plead who at W&B knew of Rice's allegedly fraudulent scheme, how W&B came upon this knowledge, or why it sought to defraud LTI.

According to the complaint, Rice allegedly asked LTI to use the $475,000 due at closing to repay the liabilities listed in column A of the schedule (¶ 54). Plaintiffs then contradict this allegation by claiming that Rice wanted to use LTI's closing payment to pay off the $400,000 due under his settlement with Investec, which would allow him to "terminate his agreement with Investec and to gain rights to the software he already represented he owned" (¶ 54 f.n. 2).

Significantly, plaintiffs allege that LTI did not fall for Rice's scheme to obtain funding for the Investec settlement; LTI instead allegedly sought proof of the liabilities on the schedule. According to the complaint, Rice failed to provide backup for the liabilities, and LTI accordingly refused to disburse the $400,000 with which Rice wanted to pay Investec (¶ 54). Also as a result of Rice's failure to prove up the loans, LTI allegedly refused to sign the Amended Agreement, declined to make any closing payment, and postponed the closing until Rice could substantiate the loans (¶ 56).

Despite its knowledge of the alleged misstatements in the Purchase Agreement, and despite Rice's inability to produce proof of $MM^2$'s loans, LTI allegedly proceeded with the acquisition of $MM^2$ (¶ 61), incurring in the process expenses for new equipment, office space, software licenses, and employee salaries (¶¶ 45-46, 62-64). Plaintiffs contend that, on June 30, 2003, LTI withheld payment of the promissory note and extended the maturity date because $MM^2$'s earnings had not reached the minimum specified in the Purchase Agreement (¶ 68).

Plaintiffs allege that in July 2003, LTI ceased operations because Rice and others entered its offices and removed all of the copies of the sourcecode for the $MM^2$ trading software (¶¶ 70-75). On July 17, 2003, Rice allegedly stole LTI's customer invoices for June 2003 and altered

them to indicate that they were payable to $MM^2$, rather than CIG (¶¶ 78-80). Following these events, Rice allegedly moved $MM^2$'s operations into the offices of defendant ABN AMRO SAGE Corp. (¶¶ 90-93), which Rice allegedly had been in merger negotiations with since August 2002 (¶¶ 82-89).

As a result of the foregoing events, LTI contends it sustained damages which are not specified in the complaint. LTI asserts that W&B is liable for state and federal securities fraud, common law fraud, negligent misrepresentation, and violations of the Consumer Fraud Act.

## III. LEGAL STANDARD

A Rule 12(b)(6) motion should be granted when it is apparent that the plaintiff can prove no set of facts consistent with the complaint that would entitle the plaintiff to relief. *Duggan v. Terzakis,* 275 F.Supp.2d 968, 971 (N.D.Ill. 2003). Rule 9(b) requires "all averments of fraud" to be "stated with particularity." In cases involving fraudulent misrepresentations, Rule 9 requires the "plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Services, Inc.,* 20 F.3d 771, 777 (7th Cir. 1994). Although states of mind may be pleaded generally, the who, when, where and how of the fraud must be pleaded in detail. *Foss v. Bear, Stearns & Co.,* 2004 WL 1102326 (N.D.Ill. 2004). Under the Private Securities Litigation Reform Act ("PSLRA"), however, a plaintiff seeking relief under Rule 10b-5 must allege particularized facts regarding the defendant's mind state. The plaintiff must: (1) specify each statement alleged to have been misleading; (2) specify the reason it was misleading; and (3) with respect to each misstatement, state "with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(B)(1)-(2).

## IV. ARGUMENT

### A. Count I fails because plaintiffs cannot allege the elements necessary to state a claim for securities fraud under Rule 10b-5.

The elements of a claim under Rule 10b-5 are that: (1) the defendant made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with purchase or sale of securities, (5) upon which the plaintiff relied, and (6) the reliance proximately caused the plaintiff's damages. *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996); *Foss v. Bear Stearns & Co., Inc.*, 2004 WL 1102326 (N.D.Ill. 2004). Rule 10b-5 does not afford a cause of action against persons who merely aid or abet violations of the rule. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 1448 (1994). Thus, to state a claim against W&B, each plaintiff must allege, with the required specificity, that W&B itself made a material misrepresentation that satisfies the above requirements. As shown below, plaintiffs cannot plead the elements of a 10b-5 claim against W&B.

The claims asserted by CIG and Carroll are facially defective. CIG was not a party to the Purchase Agreement or the Amended Agreement. The complaint does not allege that CIG purchased or sold any securities. Therefore, CIG cannot allege either reliance or a misrepresentation in connection with a securities transaction. With regard to Carroll, the complaint alleges that he purchased a 15% interest in MM$^2$ in August 2002 and assigned the interest to LTI in February 2003 (Cplt. ¶¶ 34, 41). Plaintiffs do not, however, allege that W&B provided any documents or made any statement to Carroll in connection with these transactions. In fact, plaintiffs do not allege that W&B ever communicated with CIG or Carroll. Because CIG and Carroll cannot allege any of the elements necessary to state a claim under Rule 10b-5 against W&B, their claims should be dismissed with prejudice. *Foss*, 2004 WL 1102326 at *4.

LTI alleges it received one communication from W&B: at the February 28, 2003 closing, W&B allegedly presented LTI's president with the Amended Agreement, which, according to the complaint, had been prepared by W&B and included a schedule that falsified $MM^2$'s liabilities (Cplt. ¶¶ 50, 97). LTI bases its 10b-5 claim against W&B on the conclusory allegation that W&B "participated" in Rice's alleged fraud by "assisting in the preparation of the Amended Agreement, and [by] falsifying or otherwise 'fixing' $MM^2$'s liabilities to suit both Rice's and $MM^2$'s needs" (Cplt. ¶ 97). However, the complaint does not allege facts establishing that W&B knew any item in the Amended Agreement was false. The complaint actually states that the Amended Agreement was Rice's "attempt to, at the eleventh hour, divulge" $MM^2$'s true state of affairs (Cplt. ¶ 97), which means that W&B saved LTI from moving forward on the basis of the (allegedly fraudulent) original agreement. LTI therefore cannot rely on the Amended Agreement to satisfy the heightened pleading requirements under the PSLRA.

The only misstatement that the complaint can possibly be read as charging W&B with knowledge of is the claim that the Amended Agreement's liabilities schedule falsely indicated that $MM^2$ owed W&B $8,500. Plaintiffs allege that Rice and $MM^2$ owed W&B nothing because W&B had received a $7,218 retainer (*Id.*). Assuming that the complaint attributes this misstatement to W&B, it cannot form the basis for a 10b-5 claim because plaintiffs allege no specific facts to show that the misstatement was made with scienter, that it was material, or that LTI reasonably relied upon it.

**1. Scienter**

Under the PSLRA, LTI must allege with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." The requisite mind state is either intent to deceive or reckless disregard for the truth. *Premier Capital Mgmt., LLC v.*

*Cohen,* 2003 WL 21960357 (N.D.Ill. 2004) (Gottschall, J.). Conclusory allegations that a defendant acted with knowledge that a representation was false do not satisfy this burden; the complaint must contain specific facts which show recklessness or knowledge. *Id.*; *Napier v. Bruce,* 2004 WL 1194747 (N.D.Ill. 2004) (Filip, J.).

The instant complaint is devoid of facts that support any inference, much less a strong one, that W&B intended to deceive LTI or acted with a reckless disregard for the truth. The complaint simply alleges that W&B falsified $MM^2$'s liabilities. It does not allege any motive to explain why W&B would misrepresent $MM^2$'s liabilities. It does not allege that W&B stood to gain anything from overstating $MM^2$'s liabilities, or that W&B held any interest in $MM^2$ (Cplt. ¶ 62). The complaint does not identify the W&B lawyer who allegedly falsified the liabilities or who knew of the falsity. The complaint does not specifically allege that W&B knew any liability had been falsified, including the amount $MM^2$ owed to W&B.

The courts repeatedly have held that complaints which provided far more factual detail that this one regarding the defendant's state of mind failed to allege scienter. For example, in *Premier Capital Mgmt., supra,* this Court held that the allegation that the defendants committed fraud because they had squandered the corporation's money, needed additional funds to alleviate its financial difficulties, and sought to loot the corporation for their personal gain failed to allege scienter. In *Napier, supra,* the allegation that the defendants made misrepresentations to obtain paid-in capital, equipment, and services also fell short of the PSLRA's requirements for alleging scienter. In a case that preceded the heightened pleading requirements applicable to scienter under the PSLRA, the Seventh Circuit dismissed a 10b-5 claim for failure to plead scienter because the plaintiff simply alleged that the defendant made misstatements to enhance its market value. *In re Healthcare Compare Sec. Litig.*, 75 F.3d at 284. *See also DiLeo v. Ernst & Young,*

901 F.2d 624, 628 (7th Cir. 1990). Under *Healthcare, Premier* and *Napier,* LTI clearly has failed to allege scienter with requisite specificity.

The fact that W&B is a law firm underscores the inadequacy of LTI's allegations. The courts recognize that law firms performing routine legal work, such as preparing transaction documents, have great incentive not to abet fraud. Judge Conlon observed that: "The obvious exposure to liability, coupled with potential injury to the firm's reputation, outweigh any possible gain from retaining a client. Even the individual partner or associate working on an offering memorandum would rather avoid fraud." *Boltz v. Flagship Partners Ltd. Partnership,* 1990 WL 106571 (N.D.Ill. 1990). In *Boltz,* the court dismissed a fraud claim against a law firm that allegedly prepared a private placement memorandum ("PPM"), which allegedly materially misrepresented, among other things, the seller's investments strategy. Because the plaintiffs did not identify the lawyer who committed the alleged fraud, or why he or she did so, and they did not allege that the firm had an interest in the partnership, the court dismissed the 10b-5 claim with prejudice. This analysis compels dismissal of LTI's claim, which also fails to allege the any facts concerning W&B's state of mind.

**2. Reliance**

LTI's claim under Rule 10b-5 also fails because it cannot plead reasonable reliance. LTI agreed to purchase 100% of the $MM^2$ interests more than two months before W&B allegedly misstated $MM^2$'s liability to W&B in the Amended Agreement (Cplt. ¶ 23, 50). Because the alleged misrepresentation occurred after LTI agreed to purchase the interests, it could not have relied on W&B. *Latigo Ventures v. Laventhol & Horwath,* 876 F.2d 1322, 1326 (7th Cir. 1989) (misrepresentation that postdated purchase of securities not actionable under § 10b-5) *Napier,* 2004 WL 1194747 (N.D.Ill. 2004) (same); *Perry v. Eastman Kodak Co.,* 1991 WL 629728

(S.D.Ind. 1991), *aff'd* 962 F.2d 10 (7th Cir. 1992) (same).

Moreover, LTI cannot allege reliance because it concedes it did not rely on the schedule of liabilities. LTI alleges it insisted that Rice produce backup documentation for the loans (Cplt., ¶¶ 54, 56, 98). Because Rice could not do so, LTI alleges it never disbursed the $475,000 due at closing and it declined to sign the Amended Agreement (*Id.* at ¶ 54 f.n. 2). In sum, the complaint pleads that, rather than relying on the "falsified" schedule, LTI refused to proceed further because Rice could not allay its suspicions about the schedule.

Most important, LTI's conclusory allegation of reliance fails because W&B's alleged misstatement is not of a type that could give rise to reasonable reliance. W&B is alleged to have stated that $MM^2$ owed W&B $8,500, when MM allegedly owed it nothing. An overstatement of liabilities could only deter a reasonable investor from purchasing at a given price, because the liabilities would diminish the securities' value. LTI, however, does not allege that W&B's misrepresentation deterred it from purchasing the $MM^2$ interests even though their real value merited the purchase price. LTI alleges that it sought to purchase the interests despite the alleged inflation of the amount owed to W&B. Thus, W&B's alleged misrepresentation did not produce the only form of reliance that such a misrepresentation could engender. Because LTI has not alleged reasonable reliance, its Rule 10b-5 claim fails. *See Wafra Leasing Corp. v. Prime Capital Corp.*, 192 F.Supp.2d 852, 867 (N.D.Ill. 2002) (accountant's allegedly false statement that it had not conducted an audit was type of statement that could not give rise to reasonable reliance because it contained nothing for investor to rely upon).

**3. Materiality**

A misstatement is material if it would be viewed by a reasonable investor as significantly altering the total mix of available information. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546

(8th Cir. 1997). When it is clear that a particular misstatement could not be significant to a reasonable investor due to its small magnitude, a court may properly determine on a motion to dismiss that the misstatement was immaterial as a matter of law. *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411 (N.D.Ill. 2001); *In re Newell Rubbermaid, Inc. Sec. Litig.*, 2000 WL 1705279 (N.D.Ill. 2000). Under the PSLRA, the plaintiff must specify the reasons why any misstatement relied upon in a 10b-5 claim was materially misleading. 15 U.S.C. § 78u-4(B)(1)

The one misstatement that LTI attempts to charge W&B with knowledge of – the inflation of $MM^2$'s debt to W&B – is immaterial as a matter of law. The liability in question was $8,500 owed to W&B. In return for the $MM^2$ interests, LTI agreed to provide Rice with $1,000,000 and 1,000,000 shares of LTI stock. Disregarding the value of the LTI stock, the $8,500 liability constituted a mere 0.8% of the $MM^2$ purchase price. This amount is immaterial as a matter of law. *See In re Allscripts*, 2001 WL 743411 at *10 (dismissing complaint alleging company improperly recognized $500,000 in revenues; amount was immaterial as matter of law because it overstated company's quarterly revenues by mere 4% and understated quarterly loss by mere 2%); *In re Newell Rubbermaid*, 2000 WL 1705279 at *8 ($40,000,000 in unreported expenses was immaterial as a matter of law; undisclosed expenses constituted 1% of company's total sales expense and less than 10% of pretax earnings). Furthermore, LTI has not alleged facts to explain why the alleged misstatement relating to the liability was misleading. For both reasons, LTI's 10b-5 claim fails for failure to plead materiality.

**B. Plaintiffs cannot maintain suit against W&B, a law firm, under the Illinois Securities Law.**

The Illinois Securities Law applies only to the issuer, controlling person of the issuer, underwriter, dealer, or other person by whom a sale of securities is made. 815 ILCS § 5/13.A. It is well established that lawyers who do not serve as officers or directors of the issuer do not fall

within the classes of persons who are subject to liability. *Boltz,* 1990 WL 106571 at *4 (N.D.Ill.1990) (dismissing Illinois securities law claim against law firm that prepared allegedly misleading private placement memorandum); *Excalibur Oil, Inc. v. Sullivan,* 616 F.Supp. 458, 466 (N.D.Ill.1985) (Shadur, J.) (dismissing claim against lawyer who allegedly prepared title opinion for purchaser of interest in oil and gas well; complaint revealed that investor's interest in transaction arose before lawyer's involvement and lawyer therefore was not "person by whom sale" was made).

In the instant case, plaintiffs do not allege that W&B served as an officer or director of $MM^2$. Moreover, as in *Excalibur Oil,* the complaint makes clear that LTI and Carroll were intent on purchasing $MM^2$ well before W&B allegedly prepared the Amended Agreement. Therefore, as in *Excalibur Oil* and *Boltz,* plaintiffs claim against W&B under the Illinois Securities Law fails. 616 F.Supp. at 466; *Boltz,* 1990 WL 106571 at *4. Additionally, rescission is the only remedy available to the purchaser of securities under the Illinois Securities Law. Plaintiffs cannot sue W&B for violations of the statute because they do not allege that W&B sold them securities and they therefore have no remedy against W&B under the statute.

**C. Plaintiffs cannot state a claim against W&B under the Consumer Fraud Act because the statute does not apply to lawyers providing legal services.**

The Illinois Supreme Court has made clear that the Consumer Fraud Act, 815 ILCS § 505/2, does not apply to allegations of misconduct by an attorney engaged in the practice of law. *Shalabi v. Huntington Nat. Bank,* 2001 WL 777055 (N.D.Ill. 2001); (citing *Cripe v. Leiter,* 703 N.E.2d 100, 105 (Ill. 1998)); *Collins v. Sparacio,* 2003 WL 21254256 (N.D.Ill. 2003); *Zanayed v. Gertler & Gertler, Ltd.,* 2000 WL 294183 (N.D.Ill. 2000). The legal profession's immunity from suit under the act reflects the special regulation that the Illinois Supreme Court and its agencies provide with respect to the practice of law.

Plaintiffs here seek to hold W&B liable for the professional services it provided to $MM^2$ and Rice. Plaintiff allege that W&B was counsel for Rice and $MM^2$ and in this capacity presented LTI with the Amended Agreement (Cplt. ¶¶ 50, 97). Their claims against W&B relate to the alleged misstatements in the Amended Agreement W&B drafted for Rice and $MM^2$. The practice of law encompasses the conduct for which plaintiffs are attempting to sue W&B. *People v. Peters,* 141 N.E.2d 9, 11 (Ill. 1957) (practice of law includes appearances in court, and services rendered out of court, such as rendering advice or preparing legal instruments). Because W&B's alleged preparation of the Amended Agreement constitutes the practice of law, it is subject to regulation by the Illinois Supreme Court and falls outside the ambit of the Consumer Fraud Act. Accordingly, plaintiffs' Consumer Fraud claim should be dismissed as to W&B.

**D. Plaintiffs' common law fraud claims fail for the same reasons that their claims under Rule 10b-5 fail.**

To state a claim for fraud under Illinois law, a plaintiff must allege that: (1) the defendant made a false statement of material fact, (2) the plaintiff had a right to rely on the statement, (3) the statement was made for the purpose of inducing the other party to act, (4) the plaintiff reasonably relied on the statement, and (5) the plaintiff's reliance caused him or her to suffer damages. *Israel v. National Canada Corp.*, 658 N.E.2d 1184, 1193 (Ill.App. 1st Dist. 1995). Under Rule 9, a plaintiff must allege fraud with particularity. As set forth in Part A above, plaintiffs do not allege specific facts which establish reasonable reliance, materiality, or intent to deceive. Because these are essential elements of liability for fraud, their fraud claim in Count VI should be dismissed. *See Boltz,* 1990 WL 106571 at *4 (dismissing common law fraud claim where plaintiffs failed to plead securities fraud).

**E. Plaintiffs cannot state a claim for negligent misrepresentation against W&B because they have not alleged that W&B owed them a legal duty.**

To state a claim for negligent misrepresentation, a plaintiff must allege: (1) a false statement of material fact, (2) the defendant's carelessness or negligence in ascertaining the truth of the statement, (3) an intention to induce the plaintiff to act, (4) action by the plaintiff in reliance on the truth of statement; (5) damage to the plaintiff resulting from such reliance, and (6) a duty owed by the defendant to communicate accurate information. *Fox Associates, Inc. v. Robert Half, Inc.*, 334 Ill.App.3d 90, 94 (1st. Dist. 2002). Plaintiffs' negligent misrepresentation claim fails as a matter of law because they cannot establish that W&B owed them a duty of care.

In Illinois, the general rule is that an attorney owes a duty to his or her client, but not to third parties. This rule recognizes that, since "an attorney must represent his client with zeal and undivided loyalty in adversarial matters, he cannot have fiduciary responsibilities to third parties which may interfere with his duty to his client and leave him vulnerable to liability." *Pelham v. Griesheimer,* 440 N.E.2d 96, 100 (Ill. 1982); *Schecter v. Blank,* 627 N.E.2d 106, 109 (1st Dist. 1993). A narrow exception to the general rule exists. If the primary purpose of the lawyer's representation was to benefit or influence a third party, the lawyer may owe a duty to the third party beneficiary. However, courts are loathe to extend a lawyer's duty to a third party in adversarial matters, and will do so only if there is a clear indication that the representation was intended to directly confer a benefit upon the third party. *Pelham,* 92 Ill.2d at 231.

Plaintiffs allege that, in the transaction involving the MM$^2$ membership interests, W&B represented Rice and MM$^2$ (Cplt. ¶¶ 50, 97). A stock sale is recognized as being an adversarial transaction. Accordingly, in such cases, the courts will not extend a lawyer's duty to third parties unless there is compelling evidence of an intent to create a third party beneficiary. *Astor Chauffeured Limo. Co. v. Runnfeldt Inv. Corp.,* 1988 WL 101267 (N.D.Ill. 1988). Plaintiffs here, however, do not allege any facts or circumstances that suggest that the purpose of W&B's

representation of Rice was to confer a direct benefit on them. As a result, they cannot allege that W&B owed them a duty of care, and their negligent misrepresentation claim accordingly fails. *See Astor Chauffeured Limo. Co. v. Runnfeldt Inv. Corp.*, 1988 WL 101267 (N.D.Ill. 1988) (dismissing third party's negligent misrepresentation claim against lawyer where third party did not establish intended beneficiary status); *Pelham*, 440 N.E.2d at 101 (dismissing third parties' legal malpractice claim against lawyer for failure to establish third party beneficiary status); *Schecter*, 627 N.E.2d at 110 (same)

## V. CONCLUSION

As set forth above, plaintiffs cannot allege facts sufficient to state claims for violations of Rule 10b-5, the Illinois Securities Law, or the Consumer Fraud Act, or for common law fraud or negligent misrepresentation. Weiss & Block, Chtd. therefore respectfully requests that this Honorable Court dismiss Plaintiffs' Complaint with prejudice as to this defendant, and grant such further relief as the Court deems appropriate and just.

Respectfully submitted:

WEISS & BLOCK, CHTD.

By: /s/ Thomas Browne
One of its attorneys

Thomas L. Browne
Peter E. Pederson
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601-1081
312/704-3000

# *SEE CASE FILE FOR EXHIBITS*